UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYDIANT OXIMETRY, INC., | Case No. 25-cv-00392-VC |
| Plaintiff, | |
| v. | **ORDER GRANTING RAYDIANT OXIMETRY'S MOTIONS FOR SANCTIONS AND DENYING ALC MEDICAL'S MOTION TO DISMISS** |
| ALC MEDICAL HOLDINGS LLC, | |
| Defendant. | Re: Dkt. Nos. 44, 63, 65 |

This dispute began when ALC Medical Holdings sent Raydiant Oximetry a demand letter alleging that Raydiant's medical device infringed ALC Medical's patent. This accusation was false. Raydiant's device has a "placement marker" that is permanently affixed, while the device claimed in ALC Medical's patent requires an adjustable placement marker. In fact, the Patent and Trademark Office declined to approve the patent application until it was narrowed to require that the placement marker be adjustable.

Unfortunately, patent plaintiffs send baseless demand letters to defendants with some regularity. But this was no ordinary fishing expedition. To the contrary, all evidence available to ALC Medical and its lawyers at the time they sent the letter pointed strongly towards noninfringement. The sole founder of ALC Medical, Jennifer West, used to work at Raydiant. She helped develop Raydiant's device and knew that it did not have a moveable placement marker. There was a reason for this design choice: Raydiant concluded that if the device's placement marker were moveable, it would be dangerous to the patients who use it. Presumably for the same reason, the device West developed after she left Raydiant does not contain a moveable placement marker, even though her company's patent requires one.

Thus, when Raydiant brought an action in this Court seeking a declaratory judgment of noninfringement, ALC Medical and its lawyers should have apologized and walked away. They should have realized that, whatever bad blood existed between West and her former employer, it did not justify their false infringement allegation. Instead, they doubled down. They brought counterclaims against Raydiant, including one for infringement, asserting again that Raydiant's device possessed a moveable placement marker. They also falsely alleged that West's own device practiced the invention—that is, that her device had a moveable placement marker.

In support of the infringement counterclaim, ALC Medical and its lawyers submitted several diagrams depicting Raydiant's device. On each diagram, they cited the YouTube video of a presentation Raydiant gave at an industry conference, indicating that the diagrams originated from the slide deck used in that presentation. But that was not entirely true. The lawyers manipulated one of the diagrams, superimposing dotted lines to make it seem like Raydiant's device had a moveable placement marker. Nothing in Raydiant's actual slide deck or the video of the presentation suggested that was the case.

Subsequently, Raydiant allowed ALC Medical and its lawyers to inspect the device. The inspection confirmed what all the evidence had previously suggested: the placement marker was not moveable. Again, at this point, one would have expected ALC Medical and its lawyers to drop the infringement counterclaim unconditionally. Instead, they embarked on a ham-fisted scramble to avoid liability for Raydiant's attorneys' fees. First, they refused to dismiss their infringement counterclaim (or their equally frivolous false advertising counterclaim) unless Raydiant also agreed to dismiss its declaratory judgment action, with each side to bear its own fees and costs. Naturally, Raydiant refused. Then, ALC Medical and its lawyers filed a frivolous motion to dismiss Raydiant's declaratory relief action for lack of jurisdiction, claiming falsely that Raydiant's device was an "investigational device" immune from infringement claims. Later, they cobbled together a covenant not to sue that they argued mooted Raydiant's declaratory relief claim, even though it clearly did not. At each step of the way, the position taken by ALC Medical and its lawyers became increasingly disconnected from the reality of the situation, in a

way that would have made even SNL's Tommy Flanagan blush.[1]

For all this, ALC Medical and its lawyers must be sanctioned. Raydiant is entitled to recover $1,437,075.80 in attorneys' fees. ALC Medical and Womble Bond are jointly and severally liable for this award.

## I.    FACTUAL AND PROCEDURAL HISTORY

Raydiant Oximetry is a biomedical engineering and healthcare company specializing in creating devices to improve maternal and fetal safety during childbirth. Raydiant is represented by the law firm Greenberg Traurig in this dispute. ALC Medical Holdings is a single-member LLC, with Jennifer West being the sole shareholder. ALC Medical is represented by the law firm Womble Bond Dickinson, with a case team primarily consisting of Womble Bond partners Christine H. Dupriest, Matthew Blackburn, and Barry J. Herman.

### A.

In November 2021, West began working as a consultant for Raydiant. Soon after, she was hired full-time as Raydiant's Vice President of Market Development. In that role, West oversaw the development of Raydiant's postpartum uterine device, which later became known as DAISY. The DAISY device uses suction technology to treat postpartum hemorrhage, which refers to severe bleeding during childbirth and is commonly associated with C-section deliveries. The DAISY device contains a "placement marker" designed to keep the device in place in a patient's uterine cavity during surgery. This placement marker is permanently bonded to a suction tube that removes excess blood from the patient during surgery. Raydiant settled on this design choice for patient safety purposes, as it was concerned that if the placement marker were not permanently attached to the suction tube on the DAISY device, the piece could get dislodged and left in the patient's uterus upon vaginal removal of the device. Hannula Decl. ISO Mot. for Sanctions (Dkt. No. 63-9) ¶ 32.

From the initial conception of the DAISY device to its current iteration, an attached

---

[1] *Cold Openings: Tommy Flanagan - Saturday Night Live*, YouTube (Sept. 25, 2013), https://www.youtube.com/watch?v=Qz6wHELTkr8.

placement marker has always been part of the design. *Id.* ¶ 19. West herself personally reviewed and approved the design with an attached placement marker during her time at Raydiant. In one email exchange with other Raydiant employees, West declared that the permanently bonded DAISY design was "just stunning." September 27, 2022, Email (Dkt. No. 63-12) at 2. West also was responsible for creating the illustration of the DAISY product, including the attached placement marker, that was sent to the FDA for pre-submission approval in October 2022. The FDA pre-submission process allows inventors to request feedback and guidance from the FDA regarding the classification of their medical devices to help determine whether they must seek formal approval before putting the device on the market.

Over the course of West's employment, a rift formed between her and Raydiant regarding patent application No. 63/328,257 for a postpartum hemorrhage treatment device. On April 6, 2022, the '257 Application was filed, listing West as a co-inventor along with several other Raydiant employees. Later that year, Raydiant presented West with an employment agreement that affirmed assignment of the rights to the device and its associated intellectual property to Raydiant. West refused to sign the agreement and instead sent a letter to Raydiant through her counsel asserting sole ownership of the invention identified in the '257 Application, which she claimed was entirely derived from her January 2022 invention of the product that later became the DAISY device. West ultimately agreed to take a leave of absence from Raydiant, and the two parties entered settlement negotiations. West was terminated by Raydiant on March 3, 2023.

Shortly after officially severing ties with Raydiant, West filed her own patent application claiming priority to the '257 Application. On December 12, 2023, West's application was approved and issued as patent No. 11,839,408. Every claim of the '408 Patent was amended during prosecution to require that the placement marker be moveable rather than fixed:

> a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports.

'408 Patent (Dkt. No. 18-7) at 21. After leaving Raydiant, West formed ALC Medical and

developed her own postpartum hemorrhage treatment device called KIRA. While ALC Medical originally alleged in its counterclaims that the KIRA device practiced the '408 Patent and possessed an adjustable placement marker, *see* Countercls. (Dkt. No. 18) ¶ 43, West later admitted that it does not, *see* West Decl. ISO Opp'n to Sanctions Mot. (Dkt. No. 73-8) ¶ 16.

In the time since West left the company, the FDA reviewed Raydiant's pre-submission of the DAISY device and agreed in September 2023 that it was a Class II medical device exempt from pre-market notification and approval requirements. Raydiant later filed patent application No. 18/756,562 for the DAISY device on June 27, 2024. Raydiant is currently conducting a post-market Institutional Review Board-approved clinical study of the DAISY device. It has also begun to sell the product, entering distribution contracts with medical providers and actively soliciting new customers. *See* Raydiant Amend. Interrog. Responses (Dkt. No. 52-8) at 4; *see also* Dkt. No. 52-3 (DAISY Pilot commercial agreement with Moses Taylor Medical Center); Dkt. No. 52-5 (DAISY price quotation and marketing flyer related to agreement with University of California-Davis Medical Center). The commercialized version of DAISY is the same design West approved while working at Raydiant. *See* Hannula Decl. ISO Mot. for Sanctions ¶ 11.

**B.**

On December 11, 2024, ALC Medical sent Raydiant a cease-and-desist letter through its counsel at Womble Bond. The letter accused Raydiant of willful infringement of the '408 Patent through the DAISY device and demanded that Raydiant halt all activities related to the product by January 10. ALC Medical claimed that the purported infringement came to its attention through Raydiant's presentation of the DAISY device at the Stanford Medicine Pediatric & Maternal Innovation Showcase on April 23, 2024. West also attended the pitch competition and presented the KIRA device. The demand letter threatened that absent a "satisfactory response," ALC Medical was "prepared to take all steps necessary to protect its valuable intellectual property rights, without further notice to [Raydiant], including filing a lawsuit in federal court."

Demand Ltr. (Dkt. No. 18-2) at 4.

In response to the demand letter, Raydiant preemptively filed a claim for declaratory judgment of noninfringement in this court on January 10, 2025. On February 11, ALC Medical filed an answer to the complaint as well as a counterclaim against Raydiant for infringement of the '408 Patent under 35 U.S.C. § 271. ALC Medical also asserted a counterclaim for false advertisement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), related to representations made during Raydiant's Stanford Showcase presentation. In support of its infringement counterclaim, ALC Medical alleged that the DAISY device possessed a placement marker "configured for movement." Countercls. ¶ 60. ALC Medical attached several diagrams to the counterclaims as Exhibit M, representing that they were taken directly from Raydiant's Stanford Showcase presentation. *See* Countercls. Ex. M at M-5 (citing video recording of Stanford Showcase presentation under diagram with specific timestamp). One of these diagrams, Exhibit M-5, indicated the apparent moveability of the placement marker with dashed lines.

Raydiant filed its answer to the counterclaims on March 4, asserting that the DAISY device did not infringe the '408 Patent because it did not practice every claim element. Specifically, Raydiant explained that the DAISY device's placement marker was permanently bonded to the tube and that West knew this fact from her time at Raydiant. Further, Raydiant accused ALC Medical of having "intentionally altered" Exhibit M-5 by "superimposing 'dashed lines' to purportedly show a device whose placement marker is moveable along the suction line extension . . . even though ALC knows that is not the case." Raydiant Answer at 3.

ALC Medical, through its counsel, sent Raydiant another letter on March 28, offering to dismiss its counterclaims—without prejudice—contingent on (1) Raydiant's allowing ALC Medical and Womble Bond to inspect a working model of the DAISY device to confirm noninfringement and (2) Raydiant's dismissing its declaratory judgment claim. Raydiant insisted that the counterclaims must be dismissed with prejudice, but still ultimately provided a sample DAISY device for inspection on April 18. During their inspection, ALC Medical and its counsel confirmed that the placement marker was permanently bonded to the tube of the DAISY device.

Days later, they served discovery responses admitting that the DAISY device did not infringe the '408 Patent and that they had superimposed the dotted lines onto Exhibit M-5.

Instead of moving to dismiss its counterclaims at that point, on May 2, ALC Medical filed a Rule 12(b)(1) Motion to Dismiss Raydiant's declaratory judgment claim for lack of subject matter jurisdiction. ALC Medical and its counsel argued that DAISY was an investigational device exempt from the federal patent infringement statute, meaning there was no justiciable dispute for the Court to adjudicate. They claimed they "discovered" this exempt status from the DAISY device provided to ALC Medical for inspection, which was delivered in packaging that labeled the product as an "INVESTIGATIONAL DEVICE." MTD (Dkt. No. 44) at 6–10; Blackburn Decl. ISO Opp'n to Bond Mot. (Dkt. No. 41-1) ¶ 18. ALC Medical also asked the Court to dismiss its own counterclaims without prejudice under Rule 41(a)(2), should the Court agree with its jurisdictional arguments. Alternatively, and without citing supporting authority, ALC Medical requested that both parties' claims be dismissed with prejudice with each party to bear its own fees.

During briefing on the motion to dismiss, Raydiant filed a Motion for Bond in anticipation of filing a sanctions motion. The Motion for Bond made a strong case that ALC Medical's counterclaims were frivolous, that Raydiant was destined to be the prevailing party, and that the only reasonable outcome would be entry of judgment against ALC Medical (which would free Raydiant up to seek costs and attorneys' fees). Rather than granting the Motion for Bond, the Court simply stayed the litigation so that it could consider Raydiant's impending sanctions motions and ALC Medical's Rule 12(b)(1) Motion in tandem. The day after the hearing, ALC Medical filed a reply to its Motion to Dismiss. Attached to this reply was a proposed covenant not to sue, which ALC Medical claimed mooted the dispute. ALC Medical reiterated that the case should be dismissed with each side to bear its own costs and fees.

On June 26, Raydiant filed two separate sanctions motions related to ALC Medical's counterclaims and Rule 12(b)(1) Motion. The first motion seeks sanctions pursuant to Federal Rule of Civil Procedure 11, and the second seeks sanctions pursuant to 28 U.S.C. § 1927 and the

Court's inherent authority. In advance of the September 4 hearing on the sanctions motions and ALC Medical's Motion to Dismiss, Raydiant submitted a proposed fee request of $1,449,109.70. ALC Medical opposed the request as facially unreasonable and argued that any award should be no more than $72,455.49. On September 16, the Court ordered Raydiant's counsel, Greenberg Traurig, to submit copies of its contemporaneous billing records for in camera review. When submitting those records, Raydiant modified its requested fee award to $1,437,075.80.

## II.     THE COUNTERCLAIMS

Raydiant first contends that ALC Medical and its lawyers should be sanctioned under Rule 11 for filing the patent infringement counterclaim and the false advertising counterclaim. Sanctions are warranted under Rule 11 if "(1) 'the [challenged pleading, written motion, or other paper] is legally or factually baseless from an objective perspective,' and (2) the attorneys failed to conduct 'a reasonable and competent inquiry before signing and filing [it].'" *Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956, 963 (N.D. Cal. 2015) (quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)). Both counterclaims easily meet this test.

### A.

ALC Medical and its counsel argue that because the DAISY device was not freely available to the public, they had "more leeway" under Rule 11 to bring the patent infringement counterclaim. Opp'n to Sanctions Mot. (Dkt. No. 73) at 9 (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir. 1990)). They assert that, in light of the information asymmetry between the parties, their pre-filing investigation sufficed for them to conclude it was plausible that the DAISY device possessed a moveable placement marker and that Raydiant therefore infringed the '408 Patent. But whatever additional "leeway" a patentholder might normally possess when it lacks access to the potentially infringing product, that could not possibly have justified an infringement counterclaim here. Indeed, this is not merely a case where a patentholder and its lawyers went on a fishing expedition in the hope of stumbling upon some colorable infringement claim. This is a case where all evidence available to ALC Medical and its lawyers pointed in the direction of noninfringement. In other words, all

available evidence counseled against sending a demand letter in the first place, much less asserting an infringement counterclaim.

When West worked for Raydiant, first as a consultant and then later as the Vice President of Market Development, she was intimately involved in developing the same DAISY design at issue in this case. Not only did West review and approve detailed renderings of the DAISY device clearly showing the placement marker permanently bonded to the suction line; she gave them her enthusiastic endorsement. *See* September 27, 2022, Email at 1 ("These [renderings] are amazing! . . . [T]he design is just stunning. Bravo!"). West insists that even though she had direct knowledge of the DAISY device during her time at Raydiant, she was "not aware of changes Raydiant may have secretly made from her December 2022 departure from Raydiant to when the counterclaims were filed on February 11, 2025." Opp'n to Sanctions Mot. at 11; *see also* West Decl. ISO Opp'n to Sanctions Mot. ¶ 23. Maybe so. But the ensuing "inquiry" by ALC Medical and Womble Bond into the DAISY device was still unjustified because none of their supposed evidence could have reasonably given rise to suspicions of infringement.

Previously, West and her lawyers asserted that they had watched Raydiant's presentation at the April 23, 2024, Stanford Showcase and arrived at the good faith belief that the DAISY included a moveable placement marker. *See* ALC Medical RFA Responses (Dkt. No. 67-2) at 4; *Stanford Medicine Pediatric & Maternal Innovation Showcase 2024*, YouTube (Apr. 23, 2024), https://www.youtube.com/watch?v=LUEm35JYszc. Both have since backtracked. West now states that "it was impossible to determine whether the location of the DAISY placement marker was fixed" from the presentation. West Decl. ISO Opp'n to Sanctions Mot. ¶ 15. And Christine Dupriest, a member of the Womble Bond team, similarly states that "[a]fter reviewing the entirety of the Stanford Showcase and the publicly available information about the DAISY device, [she] could neither confirm such movement nor exclude the possibility that it occurs." Dupriest Decl. ISO Opp'n to Sanctions Mot. (Dkt. No. 73-6) ¶ 14.

When Dupriest says she could not "exclude the possibility" that the placement marker was moveable, she might as well be saying that she cannot exclude the possibility that the sky

will turn green. Her backtracking statement about the Stanford video presupposes that there was a reason to suspect a moveable placement marker in the first place. But the record contains no such reason, just as there is no reason to suspect waking up to emerald clouds tomorrow. A more accurate phrasing of her declaration would be: Before I watched the video of the Stanford Showcase presentation, there was no reason to suspect that Raydiant had changed its device to include a moveable placement marker. And after watching that video, I still had no reason to suspect that Raydiant had changed its device to include a moveable placement marker.

Perhaps this is why ALC Medical and its lawyers manipulated a diagram of the DAISY device to make it seem like it had a moveable placement marker. The counterclaims reference a series of diagrams in Exhibit M that purport to explain how the DAISY device infringes the '408 patent. The diagrams cite to the video of Raydiant's Stanford Showcase presentation, thereby making it seem like they came from that presentation without alteration. And that's true of many of the illustrations. But the diagram at page M-5—the one cited as showing that the placement marker is moveable—does not appear in the counterclaims as it did in the Stanford presentation. Instead, ALC Medical's lawyers superimposed dotted lines over the original image, giving the impression that the placement marker moves:



| US 11,839,408 | Raydiant Oximetry DAISY Device |
|---|---|
| **1[f]** a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports; and | Raydiant Oximetry's DAISY Device includes a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage device to a size of the uterus, the placement marker covering one or more ports, as shown in the image below. |

See, e.g., https://www.youtube.com/watch?v=LUEm35JYszc beginning at 56:35

In other words, Exhibit M-5 makes it seem like Raydiant's presentation revealed a moveable placement marker, even though the video of the presentation provides no basis to suspect that the design of the DAISY device had changed in this way from the time West was at Raydiant. Indeed, any reasonable person watching the Stanford Showcase video would have refrained from accusing Raydiant of infringement. That is doubly true for West: the DAISY design shown during the Stanford Showcase was the exact same as the one she previously approved and included as part of the illustration produced for Raydiant's FDA pre-submission. *See* Hannula Decl. ISO Sanctions Mot. ¶ 17; Hershkowitz Decl. ISO Bond Mot. Ex. C (Dkt. No. 49-19) (emails between West and other Raydiant staff approving FDA pre-submission illustrations).

Dupriest denies that the Womble Bond team prepared and submitted Exhibit M-5 in bad faith, stating that "[i]t was not [their] intent to represent that these annotations were in the original slide/image." Dupriest Decl. ISO Opp'n to Sanctions Mot. ¶ 15. She also asserts that the annotated dashed lines were made with a different font and in red color to distinguish the exhibit from the original slide. This is difficult to swallow, particularly because counsel only submitted a black and white copy of its counterclaims to the Court, and the two fonts apparently used on Exhibit M-5 are not easily distinguishable. If Womble Bond and ALC Medical had truly been concerned about not misleading the Court, as opposed to disguising the baselessness of the infringement counterclaim, they could have easily included a disclaimer alongside the image clarifying that it had been annotated.[2]

The other publicly available information cited by ALC Medical and its counsel as evidence of potential infringement is no more credible. For example, Raydiant put the same rendering of the DAISY device approved by West on its website before ALC Medical filed its counterclaims. *See* Herskowitz Decl. ISO Sanctions Mot. (Dkt. No. 63-7) ¶ 4. And although

---

[2] If the Womble Bond lawyers had done nothing else improper in this case, perhaps it would be a bit easier to accept that the diagram did not reflect a deliberate intent to mislead. Anyway, even in the highly unlikely event that Exhibit M-5 was just a mistake, that does not change the fact that the counterclaims were objectively baseless and brought without any real investigation.

ALC Medical and its counsel point to Raydiant's subsequent '562 Patent Application as suggesting that the device had been changed to include a moveable placement marker, that is false. ALC Medical is simply wrong that any diagrams from the application show the placement marker in multiple locations.[3]

      ALC Medical and its counsel insist that their assumption of product evolution was appropriate in this case because "Ms. West's work developing similar devices led her to believe it would be beneficial for devices like the DAISY device" to possess adjustable placement markers so as "to be able to be tailored to the size of the [patient's] uterus, which changes size during pregnancy." Opp'n to Sanctions Mot. at 10; *see also* West Decl. ISO Opp'n to Sanctions Mot. ¶ 16. But even if West truly believed a moveable placement marker could be beneficial, that hunch would not be nearly enough on its own to claim patent infringement. More importantly, West's own device, KIRA, does not have a moveable placement marker, even though her patent claims one (and even though ALC Medical initially alleged in its counterclaims that the KIRA device practices the invention). If West's own device doesn't even practice her invention, why would she think that Raydiant's device did?

      Although we don't know for sure why West's KIRA device does not include a moveable placement marker, one possible explanation is that she knows such a design would be unsafe. Don Hannula, a biomedical engineer engaged by Raydiant to develop the DAISY device, stated in his declaration in support of Raydiant's Rule 11 Motion that the placement marker must be permanently affixed to the suction line for patient safety. *See* Hannula Decl. ISO Sanctions Mot. ¶ 32 (explaining that it was "common sense" that an unbonded placement marker "would run the risk of being left in the patient's uterus upon vaginal removal of the device"). Perhaps that's why West never suggested making the DAISY placement marker moveable during her time at

---

[3]  ALC Medical and its counsel also argue that their suspicion of infringement was reasonable because while Raydiant's '562 Patent Application contemplates that device components may sometimes be "permanently affixed together prior to use," that configuration is not required. Opp'n to Sanctions Mot. at 11 (quoting '562 Application (Dkt. No. 18-8) at 62). However, conditional language in a patent application is not sufficient for parties to bring a colorable infringement claim. If it were, the number of patent suits would grow exponentially overnight.

Raydiant. *See* Hannula Decl. ISO Bond Mot. ¶ 13. West's belief in the "benefits" of a moveable placement marker appears to be nothing more than a post hoc justification for ALC Medical's baseless infringement claim.

**B.**

ALC Medical's second counterclaim, brought under the Lanham Act, alleges that Raydiant made false and misleading statements during its Stanford Showcase presentation. Specifically, it alleges that Raydiant's discussion of the DAISY device's being "cleared" or "approved" by the FDA was misleading because DAISY is a Class II device exempt from premarket notification requirements. Countercls. ¶¶ 78–87.

ALC Medical and its counsel knew or should have known that the claim was objectively baseless under Ninth Circuit law. Only "commercial advertising or promotion" is actionable under 15 U.S.C. § 1125(a)(1)(B). A statement is commercial advertising if it is: (1) commercial speech; (2) made by a defendant who is in competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services; and (4) "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 834 (N.D. Cal. 2019) (quotation omitted). Raydiant's presentation at the Stanford Showcase, a one-off grant competition, clearly does not constitute "commercial advertising or promotion" under that definition. *See, e.g.*, *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067, 1097 (N.D. Cal. 2025) (holding that allegations of "a handful of private statements to Realtek's actual or prospective customers" was insufficient to state a valid Lanham Act claim). ALC Medical has no basis for asserting that Raydiant participated in a pitch competition for seed funding and industry networking to influence consumers to buy Raydiant's goods.

Neither case cited by ALC Medical in its sanctions opposition supports a different result. In *Realtek Semiconductor*, Judge Pitts held that the plaintiff had stated a valid Lanham Act claim based on representations made in one defendant's press release. 769 F. Supp. 3d at 1096. A single, brief presentation by Raydiant at a conference is not equivalent to a press release; it is

13

more akin to the private statements made to actual and potential customers that Judge Pitts found were insufficient "to plausibly suggest that MediaTek's misstatements were disseminated widely to the relevant purchasing public or within the industry." *Id.* at 1097. And in *Technoprobe S.p.A. v. Formfactor, Inc.*, a district court held that the plaintiff had alleged sufficient dissemination because, in addition to making the allegedly false statements at a conference, the defendant "continued to market and sell the Accused Products after the [conference] through its website, to which slides from the Defendants' conference presentation were posted." 2024 WL 2271885, at *7 (D. Del. May 20, 2024). ALC Medical and its counsel have made no comparable allegations that the Stanford Showcase slides are available on Raydiant's website or otherwise disseminated to potential customers.

By the time they filed their motion to dismiss, ALC Medical and Womble Bond had already capitulated on the Lanham Act counterclaim, declaring that they "had no interest in pursuing [it] as a stand-alone claim." MTD at 10 n.4. But as with the patent infringement counterclaim, the Lanham Act counterclaim has still not been dropped. Faced with the threat of sanctions liability, ALC Medical and Womble Bond have suddenly renewed their defense on the merits—albeit poorly. The false advertising counterclaim was frivolous from the time it was filed and warrants sanctions under Rule 11.

## III.    THE MOTION TO DISMISS

### A.

Raydiant also moves for Rule 11 sanctions regarding ALC Medical's Rule 12(b)(1) Motion to Dismiss and accompanying reply. In its original motion, ALC Medical argued that the Court did not have subject matter jurisdiction to adjudicate Raydiant's unripe declaratory claim because the DAISY device falls under the patent infringement statute's safe harbor for investigational medical devices. That exception states:

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary

biological products.

35 U.S.C. § 271(e)(1).

ALC Medical and its counsel claim that they "discovered" that the Section 271(e)(1) safe harbor was applicable here through their April 18, 2025, inspection of the DAISY device. *See* Blackburn Decl. ISO Opp'n to Bond Mot. ¶ 18. During the inspection, ALC Medical's counsel noticed that the model provided by Raydiant was delivered in packaging labeled "INVESTIGATIONAL DEVICE" and was "limited by Federal law to investigational use." *Id.* As noted earlier, the inspection also confirmed that the DAISY device did not have a moveable placement marker and therefore did not infringe upon the '408 Patent. But rather than immediately moving for an unconditional dismissal of its claims under Rule 41(a), ALC Medical and Womble Bond latched onto the packaging label as the grounds for filing their 12(b)(1) motion.

This jurisdictional argument is baseless on its face. To fall under the Section 271(e)(1) safe harbor, the alleged infringing act must be done "solely for uses reasonably related to the development and submission of information under a Federal law." 35 U.S.C. § 271(e)(1); *see also AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1030 (Fed. Cir. 1997) ("[S]ection 271(e)(1) requires only that the otherwise infringing act be performed solely for uses reasonably related to FDA approval." (quotation omitted)), *opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997). That is obviously not the case here. The "INVESTIGATIONAL DEVICE" labeling on the inspected DAISY model was included by Raydiant on certain individual devices subject to a post-market Institutional Review Board-approved clinical study. *See* Opp'n to MTD (Dkt. No. 52) at 6–7; Ray Decl. ISO Opp'n to MTD (Dkt. No. 52-1) ¶ 6 (explaining that the "INVESTIGATIONAL DEVICE" label was "voluntarily included by Raydiant in its clinical study as a precaution to help prevent misuse or uses of those devices beyond the subject of the study"). Contrary to their assertions of "discovery," ALC Medical and its lawyers have been aware of this clinical study from the onset of the dispute. *See* Demand Ltr. at 2 ("We understand that Raydiant Oximetry . . . is currently enrolling participants in a clinical trial to test [the

DAISY] device.”); Countercls. ¶ 45 (“Today, Raydiant is recruiting participants for a clinical trial involving DAISY.”).

Raydiant’s clinical study has no relation to securing FDA approval for the DAISY device because the product does not require it. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1265 (Fed. Cir. 2008). Both parties agree that DAISY is a Class II medical device exempt from the FDA’s 510(k) premarket notification requirements. *See* Countercls. ¶¶ 46–48; FDA Response Ltr. (Dkt. No. 52-2) (“[The FDA] concur[s] that the Daisy Device falls under 21 CFR 884.3200, with product code HFL, which is 510(k) exempt.”). Indeed, Raydiant had already entered the postpartum hemorrhage treatment market, offering the DAISY device for sale before and after the commencement of this action. *See* Raydiant Amend. Interrog. Responses (Dkt. No. 52-8) at 4; *see also* Dkt. No. 52-3 (DAISY Pilot commercial agreement with Moses Taylor Medical Center); Dkt. No. 52-5 (DAISY price quotation and marketing flyer related to agreement with University of California-Davis Medical Center). ALC Medical knew of this commercialization at the time it filed its counterclaims, alleging that “Raydiant actively encourages medical providers, by and through its sales and marketing efforts, to directly infringe the ’408 Patent.” Countercls. ¶ 71.[4]

Raydiant’s commercial use of the DAISY device obviously does not fall within the investigational safe harbor. *See Momenta Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA Inc.*, 809 F.3d 610, 621 (Fed. Cir. 2015) (*Momenta II*); *see also Proveris*, 536 F.3d at 1265 (reasoning that “Congress could [not] have intended that the safe harbor of section 271(e)(1) [would] apply to” a party selling an allegedly infringing research device); *BlueAllele Corp. v. Intellia Therapeutics, Inc.*, 2024 WL 5046278, at *3–4 (D. Del. Dec. 9, 2024) (finding that

---

[4]  In its reply, ALC Medical cites *AbTox* for the proposition that a product’s designation as a Class II device does not categorically bar the applicability of the investigational safe harbor. *See* Reply ISO MTD at 9; *AbTox*, 122 F.3d at 1029 (holding that Section 271(e)(1) may apply to Class II devices). But unlike the DAISY device, the Class II medical device at issue in *AbTox* was not exempted from premarket approval. The data collection for the FDA application in that case was thus necessary to secure federal approval and so was protected by the investigational safe harbor. *See* 122 F.3d at 1027.

Section 271(e)(1) did not apply because plaintiff alleged that defendant had used product "for basic scientific research and for commercial purposes not related to FDA submission"). "[R]outine quality control testing," like the clinical study referenced on the inspected DAISY device's packaging, is a standard "part of the post-approval, commercial production process" and is "not reasonably related to the development and submission of information to the FDA." *Momenta II*, 809 F.3d at 620. The Section 271(e)(1) safe harbor argument was thus frivolous from the start. Beyond failing to perform a reasonable and competent investigation, ALC Medical and its counsel purposefully ignored evidence disproving their argument. Accordingly, sanctions under Rule 11 are warranted, and the Motion to Dismiss on this basis is denied.

**B.**

Apparently hedging against the weakness of its safe harbor argument, ALC Medical moved in the alternative for "dismissal of both parties' claims with respect to the infringement of the current design of the DAISY device made available for inspection on April 25, 2025 with prejudice, with each party to bear its own fees." MTD at 11. In support of that position, ALC Medical and its counsel attached a proposed covenant not to sue as an exhibit to their reply brief. They argue that this covenant resolves the dispute and strips the Court of subject matter jurisdiction. This is wrong. Although a covenant not to sue certainly can moot a live controversy, it does not necessarily do so. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). ALC Medical therefore has the "burden to show that," by proposing the covenant, "it could not reasonably be expected to resume its enforcement efforts against" Raydiant. *Id.* at 92.

ALC Medical has not met that burden. While the covenant states that it is made "unconditionally and irrevocably," it is too narrowly tailored to effectively moot Raydiant's declaratory relief claim. Covenant (Dkt. No. 57-2) at 1. For example, the covenant covers only claims related to the two DAISY device models that ALC Medical inspected as they existed at the time of the inspection. *See id.* at 2. But ALC Medical has already threatened Raydiant with

action related to the development and manufacture of *any* DAISY prototypes, *see* Demand Ltr. at 2, as well as all "substantially similar" DAISY variants, Countercls. ¶ 66. Those gaps distinguish this case from *Already*. *See* 568 U.S. at 93 (holding that the dispute had been mooted by Nike's providing a covenant that prohibited it "from making any claim *or* any demand . . . cover[ing] not just current or previous designs, but any colorable imitations"). Raydiant is actively developing new prototypes and variants of the DAISY device that fall outside the scope of the covenant. *See* DeLonzor Decl. ISO Sec. 1927 Mot. (Dkt. No. 65-1) ¶¶ 3–8. Because it is reasonable to expect ALC Medical to accuse Raydiant of infringement in connection with these activities (especially given the conduct of ALC Medical and its counsel thus far), there is a live controversy supporting declaratory relief. *See ICOS Vision Systems Corp., N.V. v. Scanner Technologies Corp.*, 699 F. Supp. 2d 664, 670 (S.D.N.Y. 2010) (reasoning that a "documented history of aggressively pursuing [patent infringement claims] supports a finding of declaratory judgment jurisdiction"). Accordingly, Rule 11 sanctions are warranted for the attempt to obtain dismissal based on the covenant not to sue. And, of course, the motion to dismiss on that basis is denied.

At this point, it's worth taking a step back to reflect on what ALC Medical and its lawyers were trying to accomplish with their motion to dismiss for lack of jurisdiction. Faced with the reality that their counterclaims were frivolous, they tried everything under the sun to prevent Raydiant from being the "prevailing party" within the meaning of 35 U.S.C. § 285, which allows courts to award attorneys' fees to the prevailing party in "exceptional" patent cases. But the energy they have spent attempting to avoid liability under Section 285 has only increased their sanctions liability because their ham-fisted efforts to prevent Raydiant from becoming the prevailing party were uniformly frivolous. Had ALC Medical and its lawyers put the same amount of energy into investigating the legitimacy of their claims in the first place, they would not be in this situation.[5]

_____

[5] Speaking of creative-yet-frivolous efforts to avoid liability, ALC Medical and its lawyers also argue that they should benefit from Rule 11's 21-day safe harbor because they offered to dismiss

**C.**

Raydiant also moves for sanctions against Womble Bond under Section 1927 and the Court's inherent authority stemming from ALC Medical's Motion to Dismiss.

Section 1927 provides that an attorney, but not a party, "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions under this statute must be supported by a finding of bad faith. *Lake v. Gates*, 130 F.4th 1064, 1070 (9th Cir. 2025); *EscapeX IP LLC v. Google LLC*, 2024 WL 557729, at *1 (N.D. Cal. Feb. 12, 2024). Attorneys have a "duty [under Section 1927] to correct or withdraw litigation positions after it becomes obvious that they are meritless." *In re Girardi*, 611 F.3d 1027, 1064 (9th Cir. 2010).

The Womble Bond attorneys vexatiously multiplied these proceedings by continuing to pursue ALC Medical's frivolous counterclaims and scrambling to prevent Raydiant from becoming the "prevailing party" well past the point of reason. Womble Bond's actions here "bespeak not negligence, but bad faith: the willful continuation of a suit known to be meritless." *Edwards v. General Motors Corp.*, 153 F.3d 242, 247 (5th Cir. 1998). They have consistently refused to take the only rational course of action to end the dispute: agreeing to dismiss with prejudice ALC Medical's counterclaims under Rule 41(a)(2), refraining from filing (or at least withdrawing) the Rule 12(b)(1) motion, and allowing Raydiant to seek fees as the prevailing party. Maybe that approach could have cut against a finding that this was an exceptional case within the meaning of Section 285, but even if not, it would have dramatically reduced the amount of fees Raydiant was required to incur. Instead, ALC Medical and Womble Bond

---

their counterclaims around the time Raydiant filed its Motion for Bond. *See* Fed. R. Civ. P. 11(c)(2). But they never actually withdrew the counterclaims; instead, they conditioned their dismissal offer on (1) dismissal of Raydiant's declaratory judgment claim and (2) both parties' agreeing to cover their own attorneys' fees. *See* MTD at 11 ("ALC Medical seeks dismissal of both parties' claims with respect to the infringement of the current design of the DAISY device made available for inspection on April 25, 2025 with prejudice, with each party to bear its own fees."); Reply ISO MTD at 1 ("The Court should grant ALC Medical's motion to dismiss the claims and counterclaims of both parties with prejudice.").

rejected every offer by Raydiant to negotiate a consent judgment. *See* Sokol Decl. ISO Sanctions Mot. Reply (Dkt. No. 75-1) ¶ 9. They have only offered dismissal contingent on unreasonable terms, like Raydiant's meritorious declaratory judgment claim also being thrown out and ALC Medical's being shielded from liability for attorneys' fees. And they made frivolous arguments for why the case should be dismissed for lack of jurisdiction.

Courts also have the inherent authority to impose sanctions against a party or an attorney who "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (citation omitted); *see also Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017). "'Bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Roadway Exp.*, 447 U.S. at 766 (citation omitted) (cleaned up). Here, the only reasonable way to understand the conduct by ALC Medical and Womble Bond is that it was intentional. But even if it were unintentional, inherent-authority sanctions would be warranted for "conduct tantamount to bad faith . . . including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001). Sanctions under this Court's inherent authority are accordingly appropriate in this case.[6]

## IV.    SANCTIONS LIABILITY

### A.

Raydiant seeks an award of $1,437,075.80 in attorneys' fees stemming from Greenberg Traurig's work on this matter occurring after ALC Medical filed its counterclaims.

ALC Medical and Womble Bond do not dispute that Greenberg Traurig's requested hourly rates are reasonable. Instead, they accuse Greenberg Traurig of padding its billable hours by including (1) tasks unrelated to the challenged conduct and (2) duplicative and excessive

---

[6] Incidentally, it is impossible to accept Womble Bond's assertion that the request by its experienced team of attorneys for Raydiant's declaratory judgment claim to be dismissed with prejudice was "inadvertent." Opp'n to Sanctions Mot. at 21. Even after Raydiant flagged that dismissal with prejudice would be inappropriate in its opposition, *see* Opp'n to MTD at 2, ALC Medical continued to seek such relief in its reply, *see* Reply ISO MTD at 1, 12.

labor. That is wrong. Raydiant is seeking attorneys' fees only for work done after ALC Medical filed its counterclaims on February 11—the same counterclaims that comprise part of the sanctionable conduct at issue. And all that work was necessitated by the conduct of ALC Medical and its lawyers, from the filing of the frivolous counterclaims to the fruitless efforts to prevent Raydiant from being the prevailing party. The general case management tasks performed by Greenberg Traurig, including drafting the Joint Case Management Conference Statement and revising Raydiant's discovery requests, would not have been necessary to nearly the same extent (if at all) but for the frivolous counterclaims exploding the scope of the matter. ALC Medical and its counsel also single out the fees related to Raydiant's Motion for Bond as being inappropriate, but that motion was a reasonable response to Womble Bond's vexatious tactics. Not only was the Motion for Bond a potential deterrent against further misconduct by ALC Medical and its counsel; it also secured Raydiant a stay of proceedings pending the resolution of its sanctions motions.

ALC Medical and Womble Bond also assert that a fee request of almost $1.5 million is not proportional to a dispute where less than $1 million is at issue based on the limited sales of the DAISY device to date. They argue that Raydiant cobbled together its 1,407.3 claimed billable hours through piling on unnecessary work even after ALC Medical proposed a stipulated dismissal on March 28. But that's not true. As already discussed, ALC Medical and its lawyers conditioned their offer of a stipulated dismissal on an opportunity to inspect the DAISY device. After examining the model and confirming that Raydiant had not infringed, rather than simply dismissing their frivolous counterclaims, ALC Medical and Womble Bond insisted that each side bear its own costs and fees. When that didn't work, they filed a frivolous Rule 12(b)(1) motion to try to mitigate their own liability. Raydiant had every right to respond in kind with a robust defense, "correctly treat[ing] this case as bet-the-company litigation imperiling its only current business market and its employees." Reply ISO Fee Req. at 6. The average patent litigation costs in this district do not account for those uniquely high stakes. Nor do they account for ALC Medical's estimate that its competitor KIRA device will generate over $25 million in sales

through 2026. *See* Sokol Decl. ISO Fee Req. Reply (Dkt. No. 84-3) ¶ 2.

"By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). ALC Medical and its counsel cannot overcome that deference. Greenberg Traurig employed three partners and one associate on the core case team; this is roughly equivalent to the staffing by Womble Bond, which assigned three partners to this matter as the attorneys of record. *See* Reply ISO Fee Req. at 7. Brent Sokol, lead counsel for Raydiant, billed for this matter at a steep discount from his standard fee. *Id.* And while ALC Medical and Womble Bond complain that Greenberg Traurig had multiple attorneys working on various motions, that is simply good practice for litigating a case of this import for the client. Not only did Greenberg Traurig utilize junior associates and other staff members to assist where viable; they excluded those costs from their fee request. There was no unreasonable duplication by Greenberg Traurig here justifying a reduction in Raydiant's requested award.[7]

Generally, Rule 11 and Section 1927 sanctions should be limited to the amount necessary to deter similar kinds of misconduct in the future. *See* Fed. R. Civ. P. 11(c)(4); *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171, 1177 (Fed. Cir. 1990).[8] But that guiding principle does not warrant a reduction in the requested award here—quite the opposite, in fact. These Womble Bond attorneys were already on notice that pursuing these objectively baseless claims could render them jointly and severally liable for the full amount of

---

[7] ALC Medical and Womble Bond also argue that it is impossible to properly evaluate the reasonableness of Raydiant's fee request because Greenberg Traurig failed to provide contemporaneous billing records with their initial motion. ALC Medical and its counsel are wrong on the law, as Civ. L.R. 54-5(b)(3) advises litigants that detailed billing records are not always necessary to support a successful sanctions motion. But even if disclosure were required, Greenberg Traurig has since produced its records for in camera review. Based on its inspection of the records, the Court finds that Raydiant has provided sufficient specificity and adequate justification for its proposed fee amount.

[8] The same limitation does not exist for sanctions brought under the Court's inherent authority, which may extend to any amount of fees that a "party would not have incurred but for the bad faith" conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017).

any fee award. The risk of significant sanctions, and joint and several liability, for bringing obviously frivolous patent infringement claims was discussed at length in *Segan LLC v. Zynga Inc*, 131 F. Supp. 3d 956 (N.D. Cal. 2015), a case that Greenberg Traurig and the Court repeatedly warned Womble Bond about. *See* Reply ISO Fee Req. at 9; Bond Hr. Tr. (Dkt. No. 64-6) at 13:15–17. And the conduct by ALC Medical and its lawyers was actually worse than the conduct of the lawyers in *Segan*. ALC Medical and Womble Bond have ignored every possible red flag in bringing and litigating this case. Words alone have not acted as a deterrent to their conduct up until now, and an award of Raydiant's full fee request—with joint and several liability for lawyers and client—is perfectly appropriate as a deterrent.[9]

**B.**

The attorneys of record for ALC Medical—Christine H. Dupriest, Matthew Blackburn, and Barry J. Herman—assert that any sanctions liability should be imposed on their law firm, rather than them as individuals.[10] *See* Opp'n to Fee Req. at 1. This is a close call. At every stage of this litigation, these three attorneys have made the wrong choice. They sent a frivolous demand letter and filed baseless counterclaims despite all signs pointing against any wrongdoing by Raydiant. They included a manipulated diagram with their infringement counterclaim, passing it off as having come directly from Raydiant. And when the counterclaims were exposed as being baseless, the attorneys concocted a frivolous argument to try to strip the Court of jurisdiction.

---

[9] ALC Medical's arbitrary counterproposal of $72,455.49 is clearly not enough to effectively deter further bad behavior by a firm that generated more than $700 million in gross revenue in 2024. Further, compensation for the affected party is a relevant factor for courts to consider in imposing sanctions under Section 1927 and a court's inherent authority so long as the award does not enter the territory of punitive damages. *See Haynes v. City & County of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012) ("The purpose of § 1927 may be to deter attorney misconduct, or to compensate the victims of an attorney's malfeasance, or to both compensate and deter."); *DNA Sports Performance Lab, Inc. v. Major League Baseball*, 2020 WL 6290374, at *5 (N.D. Cal. Oct. 27, 2020) (inherent authority), *aff'd sub nom. Nix v. Major League Baseball*, 2022 WL 4482455 (9th Cir. Sept. 27, 2022).

[10] Herman did not get involved with this case until April 16, 2025. *See* Herman Pro Hac Vice Order (Dkt. No. 32). Therefore, his possible sanctions liability is limited to the misconduct that occurred after that date.

Still, the Court finds that holding Womble Bond jointly and severally liable for the entirety of a substantial sanctions award is likely—hopefully—sufficient to deter these lawyers from bringing other frivolous patent suits in the future. And this ruling should put other lawyers on notice: if they engage in bad faith conduct comparable to that of Dupriest, Blackburn, and Herman, they will be held jointly and severally liable for the full fee amount as individuals.

## V.    CONCLUSION

ALC Medical's Motion to Dismiss is denied, and Raydiant Oximetry's Motions for Sanctions are granted. ALC Medical and Womble Bond are jointly and severally liable for attorneys' fees in the amount of $1,437,075.80 to be awarded to Raydiant. Payment shall be made within 28 days of this order unless alternative terms are negotiated by the parties. A joint case management conference is scheduled for November 7 to discuss what else (if anything) needs to be done before judgment can be entered in favor of Raydiant. The parties need not file a joint case management statement.

**IT IS SO ORDERED.**

Dated: October 29, 2025

_____

VINCE CHHABRIA
United States District Judge